# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

NEIL SATTLER, on behalf of himself and all others similarly situated,

      Plaintiff,

v.

AIR METHODS CORPORATION,
AARON D. TODD,
C. DAVID KIKUMOTO,
JOSEPH WHITTERS,
RALPH J. BERNSTEIN,
MARK D. CARLETON,
JEFFREY A. DORSEY,
JOHN J. CONNOLLY,
MORAD TAHBAZ,
CLAIRE M. GULMI, and
JESSICA GARFOLA WRIGHT,

      Defendants.

_____

## CLASS ACTION COMPLAINT AND JURY DEMAND
_____

Plaintiff Neil Sattler ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder class action on behalf of themselves and all other public stockholders of Air Methods Corporation ("Air Methods" or the "Company"), against Air

Methods, and the Company's Board of Directors (the "Board" or the "Individual Defendants, and collectively with Air Methods, the "Defendants"), for violations of Sections 14(e) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company as a result of an unfair process for an unfair price, and to enjoin a Tender Offer currently scheduled to expire on April 20, 2017 in which ASP AMC Intermediate Holdings, Inc. ("Parent") and its wholly owned subsidiary, ASP AMC Merger Sub, Inc. ("Merger Sub," and together with Parent, "American Securities") will acquire each outstanding share of Air Methods common stock for $43.00 per share in cash, with a total valuation of approximately $2.5 billion (the "Proposed Acquisition").

2.      The terms of the Proposed Acquisition were memorialized in a March 14, 2017 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").

3.      On March 23, 2017, Air Methods filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "14D-9") with the Securities and Exchange Commission (the "SEC") in support of the Proposed Acquisition.

4.      Defendants breached their fiduciary duties to the Company's shareholders by agreeing to the Proposed Acquisition which undervalues Air Methods and is the result of a flawed sales process.  Post-closure, Air Methods shareholders will be frozen out of seeing the return on their investment of any and all future profitability of Air Methods.  Additionally, analyst coverage indicates a high target above the deal price - $58.00 per share, as recently as little as six months ago.

5.      The process leading up to the Proposed Acquisition was also tainted by the machinations of an activist hedge fund stockholder, Voce Capital Management ("Voce"), and its agent Dan Plants ("Plants"), who have been threatening the Company with a proxy fight for nearly two years in their crusade to force through a going private sale.

6.      Further, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, Company Board Members and executive officers will be able to exchange large, illiquid blocks of Company stock for massive payouts, in addition to receiving cash in exchange for all outstanding and unvested options and/or other types of restricted stock units.  Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Acquisition.  All stated, Company insiders stand to reap ***more than one-hundred thirty million dollars*** in profits as a result of the Proposed Acquisition.  Such large paydays upon the consummation of the Proposed Acquisition, have clearly tainted the motivations of the Board in approving it.

7.      Finally, in violation of sections 14(e) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially deficient 14D-9 on March 23, 2107 with the SEC in an effort to solicit stockholders to tender their Air Methods shares in favor of the Proposed Acquisition.  The 14D-9 is materially deficient and deprives Air Methods stockholders of the information they need to make an intelligent, informed and rational decision of whether to tender their shares in favor of the Proposed Acquisition.  As detailed below, the 14D-9 omits and/or misrepresents material information concerning, among other things: (a) the Company's financial projections; (b) the sales process of

the Company; and (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisors Goldman Sachs, Sachs & Co. ("Goldman Sachs") and Centerview Partners LLC ("Centerview").

8.      Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Acquisition or, in the event the Proposed Acquisition is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

9.      Plaintiff is an individual citizen of the State of Wisconsin.  He is, and at all times relevant hereto has been, an Air Methods stockholder.

10.      Defendant Air Methods together with its subsidiaries, provides air medical emergency transport services and systems in the United States.  The company operates in the Air Medical Services (AMS), Tourism, and United Rotorcraft (UR) segments.  The Company is incorporated in the state of Delaware and has a principal place of business located at 7301 South Peoria St., Englewood, CO 80112.   Air Methods common stock is publicly traded on the NasdaqGS under the ticker symbol "AIRM".

11.      Defendant Aaron D. Todd ("Todd") has been a member of the Air Methods Board of Directors at all relevant times.  In addition, Todd has served as the Chief Executive Officer ("CEO") of the Company at all relevant times.

12.      Defendant C. David Kikumoto ("Kikumoto") has been a member of the Air Methods Board of Directors at all relevant times.  In addition, Kikumoto has served as the Chairman of the Company Board of Directors at all relevant times.

13.     Defendant Joseph Whitters ("Whitters") has been a member of the Air Methods Board of Directors at all relevant times and also served on the Board from 1993-1997.

14.     Defendant Ralph J. Bernstein ("Bernstein") has been a member of the Air Methods Board of Directors at all relevant times.

15.     Defendant Mark D. Carleton ("Carleton") has been a member of the Air Methods Board of Directors at all relevant times.

16.     Defendant Jeffrey A. Dorsey ("Dorsey") has been a member of the Air Methods Board of Directors at all relevant times.

17.     Defendant John J. Connolly ("Connolly") has been a member of the Air Methods Board of Directors at all relevant times.

18.     Defendant Morad Tahbaz ("Tahbaz") has been a member of the Air Methods Board of Directors at all relevant times.

19.     Defendant Claire M. Gulmi ("Gulmi") has been a member of the Air Methods Board of Directors at all relevant times.

20.     Defendant Jessica Garfola Wright ("Wright") has been a member of the Air Methods Board of Directors at all relevant times.

21.     Defendants Todd, Kikumoto, Whitters, Bernstein, Carleton, Dorsey, Connolly, Tahbaz, Gulmi, and Wright identified in ¶¶ 11-20 are collectively referred to as the "Individual Defendants."

22.     Non-Party American Securities LLC, a private investment company specializing in direct and fund of fund investments.  American Securities LLC owns Non-Party Parent as a subsidiary, and through Parent, owns Merger Sub.  The firm specializes in senior debt and equity

investments in leveraged buyouts, recapitalization, going private transactions, industry consolidations, growth capital investment, and middle market investments.  American Securities LLC is headquartered at 299 Park Avenue, 34th Floor, New York, NY 10171.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

24.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Air Methods' principal place of business is located in the District of Colorado, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Air Methods common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

27. This action is properly maintainable as a class action because:

 a. The Class is so numerous that joinder of all members is impracticable. According to the Company's most recent 10-K, as of February 23, 2017, there were more than 36 million common shares of Air Methods' outstanding. The actual number of public stockholders of Air Methods will be ascertained through discovery;

 b. There are questions of law and fact which are common to the Class, including *inter alia*, the following:

  i. Whether Defendants have violated the federal securities laws;

  ii. Whether Defendants made material misrepresentations and/or omitted material facts in the 14D-9; and

  iii. Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Acquisition is consummated.

 c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

 d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

 e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.   Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES**

28.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Air Methods and owe the Company the duties of due care, loyalty, and good faith.

29.     By virtue of their positions as directors and/or officers of Air Methods, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Air Methods to engage in the practices complained of herein.

30.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.   act with the requisite diligence and due care that is reasonable under the circumstances;

b.   act in the best interest of the company;

c.   use reasonable means to obtain material information relating to a given

8

action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f.  disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

31.  In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Air Methods, are obligated to refrain from:

a.  participating in any transaction where the directors' or officers' loyalties are divided;

b.  participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public shareholders; and/or

c.  unjustly enriching themselves at the expense or to the detriment of the Company or its shareholders.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to Air Methods, Plaintiff and the other public shareholders of Air Methods, including their duties of loyalty, good faith, and due care.

33.     As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Air Methods common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

34.     Air Methods together with its subsidiaries, provides air medical emergency transport services and systems in the United States.  The company operates in the Air Medical Services (AMS), Tourism, and United Rotorcraft (UR) segments.

35.     The Company's AMS segment provides air medical transportation services to the general population as an independent service, as well as to hospitals and other institutions under operating agreements.  Its services include medical care, aircraft operation and maintenance, communications and dispatch, and medical billing and collections.  As of December 31, 2016, this segment's aircraft fleet consisted of 369 company-owned aircraft and 76 leased aircraft, as well as 49 aircraft owned by AMS customers and operated by the company under contracts with them.

36.     The Company's Tourism segment provides aerial tours and charter flights, primarily focusing on Grand Canyon and Hawaiian Island tours.  It markets its tours through Websites, as well as through various channel partners, such as online booking companies, hotels,

resorts, and cruise operators.  This segment operates 63 helicopters and 2 fixed wing aircraft under three Part 135 Air Carrier Certificates.

37.     Air Methods' UR segment designs, manufactures, installs, and certifies multi-mission interiors, and other aerospace and medical transport products for domestic and international customers.  This segment also offers quality assurance and certification services.

38.     Air Methods has shown sustained solid financial performance.  For example, in its financial report for the fourth quarter 2016, the Company reported a revenue increase of 9.2%, from $272.4 million to $297.5 million.  Additionally, the Company showed an increase in non-GAAP Adjusted EBITDA from continuing operations of 1.2%.

39.     Speaking on these positive results, Company Chairman and Defendant Todd spoke positively about the Company's financial plan and its positive implementation, stating, "Patient transports rebounded in the fourth quarter, increasing 11.1% in total and 1.5% on a same-base basis as the Company benefited from changes implemented towards the end of the third quarter and early in the fourth quarter and from more normal weather.  We remain focused on driving shareholder value by improving the utilization of the Company's assets, increasing its net revenue per transport through improvements in the Company's revenue cycle operations and increasing the percent of commercial claims that are in network, growing the Company's air medical footprint, and increasing the revenue and profitability of the Tourism operations."

40.     These recent financial results are just the latest results showcasing a trend of financial success for Air Methods, as evidenced by the Company's second quarter 2016 financials, released on August 4, 2016.  Notable highlights from these financial results included a revenue increase of 11.0% from $263.6 million to $292.6 million and an increase of 7.0% in EBITDA from

continuing operations, from $71.2 million to $76.2 million.  Speaking on these positive results, Defendant Todd commented on the Company's positive upward trajectory affirming that the Company "continued to grow".

41.     Despite this upward trajectory and glowing pronouncements by management, success, the Individual Defendants have caused Air Methods to enter into the Proposed Acquisition with American Securities, thereby depriving Plaintiff and other public stockholders of the Company the opportunity to reap the benefits of Air Methods' present and future success.

***The Flawed Sales Process***

42.     The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants

43.     The Company has from time to time reviewed strategic alternatives as it relates to the Company's future.  During such a review prior to October 27, 2015, the Company engaged Goldman Sachs and Centerview Partners as financial advisors, and Paul, Wiess, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as a legal advisor.  The 14D-9 is silent as to the specific facts around the engagement of these financial and legal advisors.

44.     On October 27, 2015, Defendants Todd and Carleton met with a representative of the principal stockholder (the "Party A Stockholder") of a private company operating within the air medical transportation industry ("Party A") to discuss a potential strategic business combination of the Company and Party A.  On January 8, 2016, the Company entered into a confidentiality agreement with Party A, which contained customary "standstill" provisions with a term of 12 months that would terminate before the expiration of such term in certain situations, including the entry by the Company into a definitive acquisition agreement with a third party that,

if consummated, would result in a third party beneficially owning at least a majority of the outstanding voting securities of the Company or all or substantially all of the assets of the Company and its subsidiaries (taken as a whole). Following execution of the confidentiality agreement, representatives of the Company and Party A, along with each party's legal counsel, held an in-person meeting in Washington D.C. on January 29, 2016 to preliminarily discuss (a) structuring alternatives for a potential transaction involving the Company and Party A and (b) the various regulatory considerations that would need to be taken into account in a connection with such a transaction.

45.     On February 26, 2016, the Chief Executive Officer of Party A (the "Party A CEO") called Mr. Todd to inform him that Party A had determined not to further pursue a potential strategic business combination of the Company and Party A at the present time.

46.     On March 7, 2016, a representative of American Securities, contacted a representative of Centerview to express American Securities' interest in engaging in conversations with the Company to gain a better understanding of the Company's operations so that it could assess the merits of a potential acquisition of the Company.  Following this conversation, representatives of Centerview relayed American Securities' interest and the details of this discussion to the Company.

47.     On June 3, 2016, the Board of Directors met to, among other things, discuss and review the discussions that had taken place to date with American Securities and the merits of permitting American Securities to potentially submit a joint bid with a co-bidder (the "Co-Bidder").  Following the conclusion of this discussion, the Board of Directors authorized (1) the Company's management to update the Company's five-year financial forecast, (2) the Finance and

Strategic Planning Committee of the Board of Directors (the "FSP Committee") to oversee and coordinate further discussions with American Securities and any other potentially interested third parties, including Party A (the "Strategic Alternative Process") and (3) American Securities to continue holding discussions with the Co-Bidder regarding potentially submitting a joint bid to acquire the Company.

48.    On June 7, 2016, American Securities provided Centerview with a high-level overview of its investment and valuation considerations as well as an initial list of key information that it would need to receive to further evaluate a potential acquisition of the Company.   On June 27, 2016, a representative of American Securities had a telephonic conversation with a representative of Centerview during which the American Securities representative reconfirmed American Securities' interest in pursuing a potential transaction and that it was continuing to work with the Co-Bidder to potentially submit a joint bid to acquire the Company.

49.    On August 17, 2016, the Party A CEO made a non-binding verbal proposal to Todd to acquire the Company at an all cash purchase price of $40.00 per Share.  The Party A CEO did not provide Todd with any further details regarding Party A's proposal.

50.    Following a discussion with the Company's financial advisors, on August 24, 2016, Todd sent an email to the Party A CEO in which he noted the Company's view that Party A's proposal significantly undervalued the Company, but also requested that Party A provide further detail on a number of topics, including (1) its proposed financing arrangements, (2) the scope and nature of any synergies that may result from a potential combination of the parties and (3) its proposed approach to addressing any regulatory considerations that may arise in a potential combination of the parties. On August 26, 2016, the Party A CEO sent a response email to Todd

in which he provided general responses to each of the Company's follow-up requests. After the FSP Committee reviewed the Party A CEO's response, the Chairman of the FSP Committee asked a representative of Centerview to contact a representative of the Party A Stockholder to inform him that, although the Company believed that Party A's proposal did not adequately reflect the value of the Company, it recognized the potential merits of a strategic transaction involving the Company and Party A and, therefore, was interested in determining whether the Party A Stockholder would be interested in pursuing a potential merger of the two companies (versus the all-cash acquisition that was previously proposed by Party A). Centerview subsequently relayed this to the Party A Stockholder during early September 2016.

51.     On August 24, 2016, a representative of American Securities called a representative from Centerview to confirm that, based on its conversations with the Co-Bidder, American Securities and the Co-Bidder were interested in jointly pursuing a potential acquisition of the Company.

52.     On September 2, 2016, each of American Securities and the Co-Bidder entered into a confidentiality agreement with the Company, which contained customary "standstill" provisions with a term of 18 months, but which do not restrict American Securities or the Co-Bidder, as applicable, during the term of the standstill from privately or publicly making any proposal for a possible transaction with the Company in certain situations, including in the event that the Company enters into a definitive acquisition agreement with a third party with respect to a transaction involving the direct or indirect acquisition by such third party of all or a controlling portion of the Company's equity securities or all or substantially all of the Company's assets.

53.     On October 20, 2016, the Board of Directors approved the Company's current five-year financial forecast and, later that day, the Company's financial advisors provided American Securities with a copy of this financial forecast, which was reviewed with members of the Company's executive team and American Securities and the Co-Bidder the following day.

54.     On December 6, 2016, American Securities submitted a written non-binding proposal (the "American Securities December 6th Proposal") to acquire all of the outstanding Shares at an all cash purchase price in the range of $38.00-$39.00 per Share.  The American Securities December 6th Proposal was subject to customary conditions, including American Securities' completion of due diligence, American Securities' receipt of debt financing commitments and the parties' negotiation of mutually acceptable definitive documentation.  The American Securities December 6th Proposal also contained a request for a 30 day exclusivity period.  The Co-Bidder was not a party to the American Securities December 6th Proposal.

55.     On December 8, 2016, a representative of the Party A Stockholder contacted Centerview to (a) express Party A's interest in continuing to pursue a potential acquisition of the Company and willingness to increase its previously proposed per Share purchase price to more than $40.00 and (b) arrange for the Company's and Party A's respective regulatory counsel to further engage on the proposed transaction's regulatory implications (the "Party A December 8th Proposal").

56.     On December 9, 2016, the FSP Committee met, along with members of the Company's senior management team and representatives from Goldman Sachs, Centerview and Company legal counsel Paul Weiss, to discuss (1) the American Securities December 6th Proposal and the Party A December 8th Proposal and (2) whether to recommend to the Board of Directors

that the Company should initiate contact with additional third parties that the Company and its financial advisors believed would potentially be interested in pursuing an acquisition of the Company. With respect to the American Securities December 6th Proposal, the FSP Committee determined that it would recommend to the Board of Directors that (x) it was not in the best interest of the Company and its stockholders to pursue a potential transaction based on American Securities' proposed per Share purchase price and (y) the Company should only consider engaging further with American Securities if it increased its proposed per Share purchase price by a meaningful amount.

57.     With respect to the Party A December 8th Proposal, the FSP Committee determined that it would recommend to the Board of Directors that, while Party A's proposed per Share purchase price did not adequately reflect the value of the Company, the parties' respective regulatory counsel should engage to further discuss the regulatory implications of such a transaction. Finally, the FSP Committee determined to recommend to the Board of Directors that the Company should engage with additional third parties that the Company and its financial advisors believed would potentially be interested in pursuing an acquisition of the Company.

58.     On December 16, 2016, representatives of Goldman Sachs and Centerview reached out to six financial sponsors regarding a potential acquisition of the Company and provided each with a form of confidentiality agreement. One of these parties ("Party B") declined to enter into a confidentiality agreement with the Company.

59.     From December 16, 2016 to December 23, 2016, the Company negotiated and entered into confidentiality agreements with each of the remaining five financial sponsors, each of which contained customary "standstill" provisions with a term of 18 months (except for one

financial sponsor where the term is 12 months), but which do not restrict the applicable financial sponsor during the term of the standstill from privately or publicly making any proposal for a possible transaction with the Company in certain situations, including in the event that the Company enters into a definitive acquisition agreement with a third party with respect to a transaction involving the direct or indirect acquisition by such third party of all or a controlling portion of the Company's equity securities or all or substantially all of the Company's assets. Following execution of its confidentiality agreement, the applicable financial sponsor was provided with a copy of the Company's management presentation and current five-year financial forecast and was offered the opportunity to arrange a call with members of the Company's senior management team.

60.     After reviewing the provided materials, two parties ("Party C" and "Party D") separately notified the Company's financial advisors that they were no longer interested in pursuing an acquisition of the Company.

61.     On December 19, 2016, American Securities submitted a written non-binding proposal (the "American Securities December 19th Proposal") to acquire all of the outstanding Shares at an all cash purchase price "in the $40s," with such proposal otherwise remaining subject to the same terms and conditions that were set forth in the December 6th Proposal.

62.     On December 22, 2016, representatives from one of the additional financial sponsors ("Party E") held a telephonic call with members of the Company's management team to discuss the Company's business, operations, strategy and financial performance.  On December 28, 2016, representatives from two of the additional financial sponsors ("Party F" and "Party G") held

separate telephonic calls with members of the Company's management team to discuss the Company's business, operations, strategy and financial performance.

63.     In late December 2016, and continuing through late February 2017, representatives from Paul Weiss and Party A's regulatory counsel held numerous calls, and exchanged various email correspondence, regarding the scope and nature of each party's antitrust assessment of a potential acquisition of the Company by Party A and the specific material information that each party would need to complete such an assessment.

64.     On January 3, 2017, Party F notified the Company's financial advisors that it was no longer interested in pursuing an acquisition of the Company.

65.     On January 6, 2017, Party G submitted a written non-binding proposal to acquire all of the outstanding Shares at an all cash purchase price in the range of $40.00-$42.00 per Share. Party G's proposal was subject to customary conditions, including completion of due diligence, receipt of debt financing commitments and the parties' negotiation of mutually acceptable definitive documentation.  Party G was subsequently given access to a virtual data room containing confidential information about the Company.

66.     On January 7, 2017, representatives of Goldman Sachs and Centerview reached out to an additional financial sponsor ("Party H") to discuss a potential acquisition of the Company and provided Party H with a form of confidentiality agreement.  On January 9, 2017, the Company and Party H entered into the confidentiality agreement, which contained customary "standstill" provisions with a term of 12 months, but which does not restrict Party H during the term of the standstill from privately or publicly making any proposal for a possible transaction with the Company in certain situations, including in the event that the Company enters into a definitive

acquisition agreement with a third party with respect to a transaction involving the direct or indirect acquisition by such third party of all or a controlling portion of the Company's equity securities or all or substantially all of the Company's assets. Following execution of its confidentiality agreement, Party H was provided with a copy of the Company's management presentation and current five-year financial forecast and was offered the opportunity to arrange a call with members of the Company's senior management team.

67.     On January 10, 2017, Party E notified the Company's financial advisors that it was no longer interested in pursuing an acquisition of the Company.

68.     On January 17, 2017, representatives of an additional financial sponsor ("Party I") initiated contact with representatives of Goldman Sachs to express Party I's interest in exploring a potential acquisition of the Company.  During that conversation, the representatives of Party I noted that Party I had the financial capacity to offer a price "in the $40s".  Following that conversation, Party I was provided with a form of confidentiality agreement and, on January 20, 2017, the Company and Party I entered into the confidentiality agreement, which contained customary "standstill" provisions with a term of 18 months, but which does not restrict Party I during the term of the standstill from privately or publicly making any proposal for a possible transaction with the Company in certain situations, including in the event that the Company enters into a definitive acquisition agreement with a third party with respect to a transaction involving the direct or indirect acquisition by such third party of all or a controlling portion of the Company's equity securities or all or substantially all of the Company's assets. Following execution of its confidentiality agreement, Party I was provided with a copy of the Company's management

presentation and current five-year financial forecast and was offered the opportunity to arrange a call with members of the Company's senior management team.

69.     In addition, on January 17, 2017, Party H notified the Company's financial advisors that it was no longer interested in pursuing an acquisition of the Company.

70.     On January 23, 2017, Goldman Sachs and Centerview distributed final bid process letters to American Securities and Party G, which indicated a final bid submission of February 15, 2017.  Goldman Sachs and Centerview also verbally informed the Party A Stockholder of the February 15, 2017 bid submission deadline.

71.     On January 28, 2017, Party G informed the Company's financial advisors that, while it remained interested in potentially acquiring the Company, it was unwilling to continue to participate in a competitive process and therefore it was withdrawing its previous proposal.

72.     On January 30, 2017, the FSP Committee met with representatives of Goldman Sachs and Centerview to discuss the current status of the ongoing interactions with each of the remaining interested third parties.  Based on the discussion of feedback from each of the remaining interested parties regarding their respective ability to complete their diligence and submit a final proposal by the February 15, 2017 bid deadline, the FSP Committee authorized the Company's financial advisors to extend the final bid deadline to March 3, 2017.  Later that day, Goldman Sachs and Centerview informed all of the remaining interested parties of the new bid deadline.

73.     On January 31, 2017, Party I submitted a written non-binding proposal to acquire all of the outstanding Shares at an all cash purchase price in the range of $42.50-$45.00 per Share. Party I's proposal was subject to customary conditions, including completion of due diligence

(which it anticipated it could complete in four weeks), receipt of debt financing commitments and the parties' negotiation of mutually acceptable definitive documentation.

74.     Also, on January 31, 2017, Party A submitted a letter (the "Party A January 31st Proposal") that set forth the terms of a revised non-binding proposal to acquire all of the outstanding Shares at an all cash purchase price of $41.00 per Share.  In its proposal, Party A also provided a general standard for determining the amount of divestitures and/or other actions it was willing to commit to in order to obtain all required regulatory approvals and the size of the breakup fee it would be willing to pay to the Company if the parties were unable to obtain all such regulatory approvals.

75.      On February 9, 2017, the Board of Directors approved an updated version of the Company's five-year financial forecast and, from February 9, 2017 through February 13, 2017, American Securities, Party A and Party I were provided with the updated version of the financial forecast.

76.     On February 13, 2017, the Company and Party A entered into an amendment to their existing confidentiality agreement to, among other things, extend the term of the standstill provisions (which had previously expired) for an additional 12 months but which did not otherwise modify in any way the underlying scope of the standstill provisions.  Following execution of this amendment, the Company's financial advisors commenced the process of providing Party A with further due diligence information previously requested by Party A.

77.     On February 23, 2017, Party I notified the Company's financial advisors that it was no longer interested in pursuing an acquisition of the Company.

78.     On February 26, 2017, American Securities was provided with an updated version of the Company's five-year financial forecast (the "Company Financial Forecast") reflecting certain minor modifications made by the Company's senior management (see "*Item 4—The Solicitation or Recommendation—Certain Unaudited Prospective Financial Information*" for further details regarding the Company's five-year financial forecast).

79.     On February 28, 2017, the Company announced its financial results for the quarter and year ended December 31, 2016, and filed its Annual Report on Form 10-K the next day.

80.     On March 1, 2017, Party A was provided with the Company Financial Forecast.

81.     Early in the morning of March 3, 2017, the Company received a letter from Party A that (a) stated it was not yet in a position to submit a final bid, including comments on the previously-provided draft merger agreement and company disclosure letter, by the close of business because it still required additional diligence and (b) based on operational improvements reflected in the Company's recently announced financial results, it could potentially increase its offer price to $43.00 per share (while also noting that there could be a potential path to further increase its offer price following completion of its required diligence).

82.     During the evening of March 3, 2017, the Company received a final bid package from American Securities that included (a) a revised written non-binding proposal to acquire all of the outstanding Shares at an all cash purchase price of $42.00 per Share, (b) revised drafts of the merger agreement and company disclosure letter and (c) an initial draft of an equity commitment letter (which also included a limited guarantee) from certain American Securities-managed funds.   The proposal noted that American Securities had received debt financing commitment letters from various financial institutions and that American Securities would share

the details of those commitments upon the Board of Directors' acceptance of its proposal. American Securities also (1) requested a seven-day exclusivity period and (2) noted that it could complete all of its remaining diligence in one to three business days.

83.     During the evening of March 6, 2017, American Securities provided the Company with a revised bid package that included (a) a revised written non-binding proposal to acquire all of the outstanding Shares at an all cash purchase price of $42.25 per Share, (b) the latest drafts of the commitment letters it had received from its debt financing sources and (c) a revised draft of the equity commitment letter.

84.     From March 8, 2017 through March 13, 2017, Company senior management and representatives from Goldman Sachs and Centerview conducted discussions with representatives from both American Securities and Party A.  During this time Party A did not submit any further proposals to acquire the Company.

85.     During the afternoon of March 13, 2017, American Securities informed the Company that it was willing to increase its per Share offer price to $43.00, which was conditioned on the Company and American Securities executing the merger agreement prior to the opening of trading on the NASDAQ Stock Market on March 14, 2017.  Later that afternoon and in response to a request from American Securities, with the permission of the FSP Committee, Defendant Todd had a telephonic conversation with representatives of American Securities to discuss, in the event the Board of Directors approved a transaction with American Securities, Defendant Todd's interest in (a) continuing as Chief Executive Officer of the Company following the closing of the potential transaction and (b) potentially making an equity investment in the Company following the closing of the potential transaction.

86.     During the evening of March 13, 2017, the Board of Directors held a meeting, which was attended by members of the Company's senior management team and representatives from Goldman Sachs, Centerview and Paul Weiss, to review and discuss the terms of American Securities' final proposal.  Each of Goldman Sachs and Centerview reviewed with the Board of Directors their respective financial analysis with respect to the proposed transaction.  Each of Goldman Sachs and Centerview then rendered an oral opinion, which was subsequently confirmed by delivery of a written opinion from each of Goldman Sachs and Centerview, each dated as of March 14, 2017, that, as of such date and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations set forth therein, the per share price of $43.00 to be paid to the holders of Shares (other than as specified in such opinion) in the Offer and the Merger pursuant to the merger agreement was fair from a financial point of view to such holders.

87.     The Company and American Securities thereafter executed the Merger Agreement.

88.     On March 14, 2017, the Proposed Acquisition was announced via joint press release.

### The Proposed Acquisition

89.     On March 14, 2017, Air Methods and American Securities issued a joint press release announcing that Air Methods had agreed to be acquired by American Securities in the Proposed Acquisition.  The press release states in relevant part:

> **Englewood, CO and New York, NY — March 14, 2017** — Air Methods Corporation (NASDAQ: AIRM), a global leader in air medical transportation and air tourism, today announced that it has entered into a definitive agreement to be acquired by affiliates of American Securities LLC. Under the terms of the agreement, affiliates of American Securities will acquire all outstanding shares of Air Methods for $43.00 per share in cash. This represents a 20.4% premium to Air Methods' stock price of $35.70 on January 31, 2017 prior to press speculation regarding a sale, and a 24.7% premium to 30-day volume-weighted average price of $34.49 as of the same date.  The transaction, which was unanimously approved

by Air Methods' Board of Directors, has a total enterprise value of approximately $2.5 billion, including net debt.

"This transaction will enable us to continue to execute against our strategy and strengthen our market position as a global leader in air medical transportation and air tourism," said Aaron Todd, Chief Executive Officer. "American Securities offers us a great opportunity to continue to invest and pursue long-term growth with greater operational flexibility, and we look forward to working with such a sophisticated private equity investor. Importantly, patients, employees, customers and partners will continue to benefit as we execute against our strategy."

Air Methods is the largest domestic air medical transport provider in the $5 billion air medical market, serving 48 states with over 300 bases of operations and one of the youngest fleets in the industry. Air Methods also maintains a leading position in the complementary air tourism business, with access to attractive fast-growing end markets. The company's multi-pronged strategy to drive long-term growth includes a focus on improving the utilization of the company's assets, growing the company's air medical footprint in underserved markets and increasing the revenue and profitability of the tourism operations.

"We are pleased to have reached this agreement, which will deliver certain and immediate cash value and a compelling premium to our stock price prior to press speculation for our shareholders," said C. David Kikumoto, Air Methods' Chairman of the Board of Directors. "We are confident that today's announcement represents the best path forward for all of Air Methods' stakeholders and appreciate the leadership of Morad Tahbaz, the Chairman of the Finance & Strategic Planning Committee, who led the Board through this process."

"We strongly believe in Air Methods' strategic direction and the opportunities to grow the company's leading positions in the attractive air medical and air tourism markets," said Marc L. Saiontz, a Managing Director of American Securities. "We respect the company's commitment to providing access to patients in the communities that need it the most, with a focus on quality of care and safety in aviation. We look forward to partnering with the Air Methods team to drive value."

Transaction Details

The transaction will be completed through a cash tender offer for all of the outstanding common shares of Air Methods, followed by a merger in which remaining common shares of Air Methods would be converted into the right to receive the same $43 cash per share price paid in the tender offer. Air Methods' Board of Directors unanimously recommends that Air Methods shareholders tender their shares in the offer. The transaction is conditioned upon satisfaction of the minimum tender condition, which requires that shares representing more than 50% of the Air Methods' outstanding common shares be tendered, as well as other customary closing conditions, including expiration of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. The transaction is expected to close by the end of the second calendar quarter of 2017.

Goldman Sachs, Sachs & Co. and Centerview Partners LLC are serving as financial advisors and Paul, Weiss, Rifkind, Wharton & Garrison LLP and Holland & Hart

LLP are serving as legal advisors to Air Methods. Weil, Gotshal & Manges LLP is serving as legal advisor to American Securities.

***The Inadequate Merger Consideration***

90.     Significantly, analyst expectations, the Company's strong market position, extraordinary growth, and positive future outlook, establish the inadequacy of the merger consideration.

91.     First, the compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering double-digit increases in revenues reported by the Company in at least two quarters of the past financial year.

92.     Next, analyst coverage indicates a high target above the deal price, with analysts at Oppenheimer Holdings Inc., valuing the Company at $58.00 per share as recently as August of 2016, a value that is approximately 25.86% greater than the valuation offered to Plaintiff and other public stockholders in the Proposed Acquisition.

93.     Finally, Air Methods future success is extremely likely, given the high demand that exists in its niche industry compared to a relatively limited supply pool.  As noted by Rich Smith in a November 4, 2016, *Motley Fool* article, Air Methods stock soared nearly 17% in fall of 2016 after its 2016 Q3 financials were released, even though such financials reported a slight dip in the Company's performance.  Explaining this phenomenon, Smith noted that Air Methods will inevitably "start growing" due to the "sad fact...that eventually, people are going to start getting hurt again and need[] medevac services…"

94.     Obviously, the opportunity to invest in such a niche industry with one of the few solid providers of MedEvac services is a great coup for American Securities, however it undercuts the foresight and investment of Plaintiff and all other public stockholders who have done the same.

95.     Moreover, post-closure, Air Methods stockholders will be completely cashed out from any and all ownership interest in the Company, forever foreclosing them from receiving any future benefit in their investment as Air Methods continues on its upward financial trajectory.

96.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for American Securities at the expense of Air Methods and Air Methods stockholders, which clearly indicates that Air Methods stockholders were not an overriding concern in the formation of the Proposed Acquisition.

***Potential Conflicts of Interest***

97.     There is strong evidence that the Proposed Acquisition may be the result of an activist stockholder's latest machinations to extract value from Air Methods for itself, with no thought to the Plaintiff or other public stockholders of the Company.

98.     Notably, as recounted by Ronald Orol of *The Street*, in a March 14, 2017 article, activist hedge fund Voce Capital Management's ("Voce") Dan Plants ("Plants") who, in September 2015, reported a 4.9% stake in the Company while at the same time launched a campaign, "[U]rging the…Company to hire a financial adviser and explore a sale or privatization of the business."

99.     As noted by Orol, even after hiring financial advisers to assess such a situation in November of 2015, and coming to the conclusion that staying independent was in the best interest

of Company stockholders, the Company could not shake Voce and Plants, who were determined to force through a sale of the Company.

100.    Subsequently, to avoid a Proxy contest initiated by Voce, the Company agreed to expand its Board to 12 members (adding a dissident director favored by Plants) and, notably, "amended its bylaws…to require all board members be elected annually, rather than in staggered terms."

101.    Obviously, such tactics were forced through by Voce and Plants hoping to sow the seeds of a future sale, and profits for themselves, at any expense.  As Orol puts it, "A declassified board set the stage for a resurgent Plants in 2017.  Likely discouraged by the company's failure to sell itself, Plants launched another director-election contest, this time seeking to elect four dissident directors to the company's board.  The contest had been scheduled for an annual meeting set for May 17."

102.    Specifically, on February 15, 2017, Voce issued a scathing press release, categorizing the situation at Air Methods as having "unraveled" and accusing the Board of Directors of substantially mismanaging the Company, resulting in Air Methods being extremely undervalued.  Of particular note was Voce's concerns that the Company had not sufficiently "de-staggered" the Board of Directors so as to subject all Air Methods' Director positions to an annual shareholder vote.

103.    The February 15, 2017, Voce letter also accused the Board of having "little 'skin in the game'", noting that the Board has been a net seller of over 1.2 million Company shares in the last ten years, with almost no Director purchasing shares over the same time period.

Furthermore, Voce characterized Director pay as "gratuitous" and arising from "grossly excessive tenures".

104.    Finally, the February 15, 2017, Voce letter nominated four candidates for Board seats, including Plant, seeking to gain control over the Company.

105.    Clearly, for the entirety of the sales process engaged in by Air Methods and the Individual Defendants, and for a significant amount of time prior, the Company has been embroiled in dealing with Voce.  Specifically, the Individual Defendants, having been publicly charged with mismanagement and excessive pay while having little interest in the success of the Company by Voce, were likely keen to wash their hands of the matter before any changes could take place that would lessen their influence or monetary interest in the Company.

106.    Incredibly, despite the obvious pressures that Voce's actions must have placed on the Board leading up to and during the sales process, the Company and Individual Defendants deemed that neither Voce, Plant, nor their activist conduct was consequential enough to Air Methods' stockholders to merit even a single mention in the 14D-9.

107.    In addition to the pressures placed upon the Board by activist stockholder Voce, Air Methods is the subject of numerous pending Class Action lawsuits in this District for unfair business practices regarding its pricing scheme.  These numerous pending lawsuits add further pressure to the already tense situation the Board found itself in due to Voce's public meddling, and likely contributed to the Board's desire to sell the Company quickly, at the basest of valuations, to any buyer, in order to wash their hands of the situation.

108.    Again, despite the numerous pressures and effects that such sweeping lawsuits must have against entire sectors of Air Methods' business during such a vital time as the sales process,

these various federal class action lawsuits warrant nary a mention in the 14D-9, leaving public Air Methods' stockholders debating the important question of whether to tender their shares during the Proposed Acquisition in the dark.

109.    The deal itself was likely also tainted by the self-interest of the Individual Defendants.  Certain insiders stand to receive massive financial benefits as a result of the Proposed Acquisition, as the large, illiquid chunks of shares currently held by certain Defendants and Company insiders will be exchanged for cash.  For example, upon the consummation of the Proposed Acquisition, Defendant Bernstein in particular stands to make over ***one hundred and seventeen million dollars*** from an exchange of his currently owned stock of the Company.  Other Company insiders will receive similarly large payouts for their large, illiquid portions of Company stock as follows:

| Name of Executive Officer or Director | Number of Shares (#) | Cash Consideration for Shares ($) |
|---|---|---|
| Aaron D. Todd | 62,900 | 2,704,700 |
| Peter P. Csapo | — | — |
| Michael D. Allen | 24,548 | 1,055,564 |
| Crystal L. Gordon | 4,337 | 186,491 |
| David M. Doerr | 5,000 | 215,000 |
| Sharon Keck | 23,547 | 1,012,521 |
| Ralph J. Bernstein | 2,737,216 | 117,700,288 |
| Mark D. Carleton | 13,969 | 600,667 |
| John J. Connolly, Ed.D | 5,774 | 248,282 |
| Jeffrey A. Dorsey | 5,774 | 248,282 |
| Claire M. Gulmi | 1,016 | 43,688 |
| C. David Kikumoto | 68,441 | 2,942,963 |
| Morad Tahbaz | 40,823 | 1,755,389 |
| Joseph E. Whitters | 7,500 | 322,500 |
| MG Jessica L. Wright, USA (Ret.) | — | — |
| **All of our current directors and executive officers as a group** | **3,000,845** | **129,093,335** |

110.    In addition, under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding Company option, equity award, restricted stock unit, or other right to purchase Company stock will vest and be cancelled in exchange for the right to

receive the Merger consideration, instantly converting additional large, illiquid holdings of many of the Individual Defendants and other Company insiders into cash.

111.    Significantly, upon information and belief, members of the Company's Board and other Company insiders collectively own thousands of such options for which they will receive immediate liquidity as follows:

| Name of Executive Officer or Director | Number of Shares Subject to Vested Options (#) | Weighted- Average Exercise Price Per Share ($) | Cash Consideration for Vested Options ($) | Number of Shares Subject to Unvested Options (#) | Weighted Average Exercise Price Per Share ($) | Cash Consideration for Unvested Options ($) | Total Cash Consideration for Options in Merger ($) |
|---|---|---|---|---|---|---|---|
| Aaron D. Todd | 30,698 | 44.03 | — | 93,636 | 46.56 | 189,130 | 189,130 |
| Peter P. Csapo | — | — | — | 13,892 | 36.32 | 92,799 | 92,799 |
| Michael D. Allen | 12,279 | 44.03 | — | 38,959 | 45.62 | 94,561 | 94,561 |
| Crystal L. Gordon | 8,869 | 44.03 | — | 28,136 | 45.62 | 68,293 | 68,293 |
| David M. Doerr | 20,915 | 44.16 | — | 34,630 | 45.62 | 84,057 | 84,057 |
| Sharon Keck | 6,822 | 44.03 | — | 14,351 | 45.46 | 31,520 | 31,520 |
| Ralph J. Bernstein | 20,698 | 44.78 | 23,566 | 7,319 | 34.63 | 61,260 | 84,826 |
| Mark D. Carleton | 20,698 | 44.78 | 23,566 | 7,319 | 34.63 | 61,260 | 84,826 |
| John J. Connolly, Ed.D. | 21,598 | 44.18 | 34,921 | 7,319 | 34.63 | 61,260 | 96,181 |
| Jeffrey A. Dorsey | 21,598 | 44.18 | 34,921 | 7,319 | 34.63 | 61,260 | 96,181 |
| Claire M. Gulmi | 6,980 | 46.75 | — | 7,319 | 34.63 | 61,260 | 61,260 |
| C. David Kikumoto | 25,492 | 45.50 | 26,903 | 8,649 | 34.63 | 72,392 | 99,295 |
| Morad Tahbaz | 20,698 | 44.78 | 23,566 | 7,319 | 34.63 | 61,260 | 84,826 |
| Joseph E. Whitters | — | — | — | 7,319 | 34.63 | 61,260 | 61,260 |
| MG Jessica L. Wright, USA (Ret.) | — | — | — | 7,319 | 34.63 | 61,260 | 61,260 |

112.    Additionally, the above information does not include restricted shares, RSUs, or PSUs, which will grant Defendants and other Company insiders even further consideration apart from the Plaintiff and class members.  Upon information and belief, members of the Company's Board and other Company insiders collectively own thousands of such additional restricted units for which they will receive immediate liquidity as follows:

| Name of Executive Officer or Director | Number of Restricted Shares (#) | Cash Consideration for Restricted Shares ($) | Number of RSUs (#) | Cash Consideration for RSUs ($) | Number of PSUs (#) | Cash Consideration for PSUs ($) |
|---|---|---|---|---|---|---|
| Aaron D. Todd | 48,146 | 2,070,278 | 7,931 | 341,033 | 43,323 | 1,862,889 |
| Peter P. Csapo | 16,939 | 728,377 | 4,001 | 172,043 | 8,002 | 344,086 |
| Michael D. Allen | 19,055 | 819,365 | 3,966 | 170,538 | 18,555 | 797,865 |
| Crystal L. Gordon | 18,084 | 777,612 | 2,864 | 123,152 | 13,400 | 576,200 |
| David M. Doerr | 25,446 | 1,094,178 | 3,525 | 151,575 | 16,493 | 709,199 |
| Sharon Keck | 13,309 | 572,287 | 1,322 | 56,846 | 7,344 | 315,792 |
| Ralph J. Bernstein | 1,059 | 45,537 | — | — | — | — |
| Mark D. Carleton | 1,059 | 45,537 | — | — | — | — |
| John J. Connolly, Ed.D | 1,059 | 45,537 | — | — | — | — |
| Jeffrey A. Dorsey | 1,059 | 45,537 | — | — | — | — |
| Claire M. Gulmi | 1,059 | 45,537 | — | — | — | — |
| C. David Kikumoto | 1,251 | 53,793 | — | — | — | — |
| Morad Tahbaz | 1,059 | 45,537 | — | — | — | — |
| Joseph E. Whitters | 1,059 | 45,537 | — | — | — | — |
| MG Jessica L. Wright, USA (Ret.) | 1,059 | 45,537 | — | — | — | — |

113.    Moreover, certain employment agreements with several Air Methods officers or directors are entitled to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by Air Methods' common stockholders.

114.    The following table sets forth the Golden Parachute compensation for certain Air Methods directors and officers, as well as their estimated value payable:

| Name(1) | Cash ($)(2) | Equity ($)(3) | Perquisites/ Benefits ($)(4) | Total ($) |
|---|---|---|---|---|
| **Named Executive Officers** | | | | |
| Aaron D. Todd | 3,886,009 | 4,463,330 | 24,770 | 8,374,109 |
| Michael D. Allen | 1,547,518 | 1,882,286 | 12,001 | 3,441,805 |
| Trent J. Carman | 0 | 0 | 0 | 0 |
| Crystal L. Gordon | 1,202,740 | 1,606,517 | 17,343 | 2,826,600 |
| David M. Doerr | 1,401,357 | 2,039,869 | 17,366 | 3,458,592 |
| Peter P. Csapo | 1,558,028 | 1,337,305 | 17,366 | 2,551,698 |

115.    It is no wonder that, in the face of losing control of the Company to Voce and the mounting pressure of several lawsuits, coupled with extremely lucrative profits for themselves, the

Board, from a position of weakness, allowed the Company to be sold far under its proper value in order to secure a quick sale.

116.     Thus, while the Proposed Acquisition is not in the best interests of Air Methods' stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete Preliminary 14D-9**

117.     On March 23, 2017, Air Methods filed with the SEC a materially misleading and incomplete 14D-9 that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

<u>Omissions and/or Material Misrepresentations Concerning Air Methods' Financial Projections</u>

118.     The 14D-9 fails to provide material information concerning financial projections provided by Air Methods' management, reviewed with Air Methods' and relied upon by Goldman Sachs and Centerview in their analyses.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

119.     The 14D-9 discloses several Unlevered Free Cash Flows ("UFCF"), a non-GAAP accounting metrics; however, the 14D-9 does not reconcile UFCF to the most directly comparable GAAP financial measure because, the Company claims it could not do so without "unreasonable

efforts." (14D-9 at 35).  Significantly, however, the Company notes that the GAAP financial metric may be "materially different" from the UFCF metric.  *Id*. Providing these non-GAAP metrics without reconciling the non-GAAP projections to GAAP measures makes the provided disclosures materially incomplete and misleading.

120.    Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a 14D-9 that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

121.    Additionally, the 14D-9 fails to disclose the following projections:

     (i)      Restructuring Charges;

     (ii)     Asset impairment charges; and

     (iii)    Stock based compensation.

122.    Without accurate projection data presented in the 14D-9, Plaintiff and other stockholders of Air Methods are unable to properly evaluate the Company's true worth, the accuracy of Goldman Sachs or Centerview's financial analyses, or make an informed decision whether to tender their Company stock in the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition*

123.    Specifically, the 14D-9 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Acquisition.  In particular, the 14D-9 fails to disclose:

a.  The specific facts and reasoning related to the reasons why the Company determined it necessary to retain both Goldman Sachs and Centerview;

b.  The differences, if any, between the various standstills provisions entered into as part of non-disclosure agreements between the Company and various interested third parties during the sales process, and the reasons for said differences;

c.  The existence of Voce, Plant, or their activist actions before and during the sales process, including no less than two threatened proxy fights, and an agreement between them and the Board to expand the amount of Directors and determine how they are elected;

d.  The effect, if any, the threatened proxy fights and other activist actions initiated by Voce and Plant had on the sales process and ultimate decision to enter into an agreement to sell the Company;

e.  The existence of various pending Federal class action lawsuits against Air Methods for, amongst other things, unfair pricing schemes leading up to and during the sales process; and

f.  The effect, if any, the pending Federal class action lawsuits had on the sales process and ultimate decision to enter into an agreement to sell the Company.

_Omissions and/or Material Misrepresentations Concerning The Financial Analyses by Goldman Sachs and Centerview_

124.    In the 14D-9, Goldman Sachs and Centerview describe their respective fairness opinions and the various valuation analyses performed to render such opinions.  However, the

descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

125.    For example, the 14D-9 does not disclose material details concerning the analyses performed by Goldman Sachs in connection with the Proposed Acquisition, including (among other things):

a.  _Illustrative Present Value of Future Share Price Analyses_:

With respect to Goldman Sachs' Selected Companies Analysis, the 14D-9 fails to disclose:

i.   The illustrative one year forward enterprise value / EBITDA multiples and range of implied enterprise values derived by Goldman Sachs for the Company.

ii.  The specifics inputs and assumptions utilized to derive the discount rate of 12%.

b.  _Illustrative Discounted Cash Flow Analysis_

With respect to Goldman Sachs' _Illustrative Discounted Cash Flow Analysis_, the 14D-9 fails to disclose:

i.   The UFCF derived by Goldman Sachs if different from the UFCF derived by the Company Forecasts.

ii.  The specifics inputs and assumptions utilized to derive the discount rate range of 9%-10.5% used in the analysis.

iii. The terminal values calculated.

          iv.  The basis for the applying a perpetuity growth rate range of 1.0%-2.0%.

c.  *Selected Precedent Transactions Analysis*

With respect to Goldman Sachs' *Selected Precedent Transactions Analysis*, the 14D-9 fails to disclose:

          i.  The objective selection criteria and the observed transaction by transaction multiples and metrics examined.

          ii.  The individual transaction values for each of the selected transactions.

126.    Furthermore, the 14D-9 does not disclose material details concerning the analyses performed by Centerview in connection with the Proposed Acquisition, including (among other things):

a.  *Discounted Cash Flow Analysis*

With respect to Centerview's *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose:

          i.  The UFCF derived by Goldman Sachs if different from the UFCF derived by the Company Forecasts.

          ii.  The specifics inputs and assumptions utilized to derive the discount rate range of 9.5%-10.5% used in the analysis.

          iii.  The terminal values calculated.

          iv.  The basis for the applying a perpetuity growth rate range of 1.0%-2.5%.

b.  *Selected Transactions Analysis*

With respect to Centerview's *Selected Transactions Analysis*, the 14D-9 fails to disclose:

      i.  The objective selection criteria and the observed transaction by transaction multiples and metrics examined.

      ii.  The individual transaction values for each of the selected transactions.

127.    Without the omitted information identified above, Air Methods' public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Air Methods' public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Acquisition is in their best interests.

## FIRST COUNT

### Claim for Breach of Fiduciary Duties

### <u>(Against the Individual Defendants)</u>

128.    Plaintiff repeats all previous allegations as if set forth in full herein.

129.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public shareholders.

130.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Air Methods.

131.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the shareholders of Air Methods by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Air Methods to its public shareholders.

132.     Indeed, Defendants have accepted an offer to sell Air Methods at a price that fails to reflect the true value of the Company, thus depriving shareholders of the reasonable, fair and adequate value of their shares.

133.     Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed vote on whether to approve the Merger.

134.     The Individual Defendants dominate and control the business and corporate affairs of Air Methods, and are in possession of private corporate information concerning Air Methods's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Air Methods which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

135.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

136.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Air Methods' assets and have been and will be prevented from obtaining a fair price for their common stock.

137.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

138.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

## Violations of Section 14(e) of the Exchange Act

## (Against All Defendants)

139.    Plaintiff repeats all previous allegations as if set forth in full herein.

140.    Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in favor of the Proposed Acquisition.

141.    Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

142.     The 14D-9 was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the 14D-9 is materially misleading and omits material facts that are necessary to render them non-misleading.

143.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

144.    The Individual Defendants were at least negligent in filing a 14D-9 that was materially misleading and/or omitted material facts necessary to make the 14D-9 not misleading.

145.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Acquisition.

## THIRD COUNT

## Violations of Section 20(a) of the Exchange Act

## (Against all Individual Defendants)

146.     Plaintiff repeats all previous allegations as if set forth in full herein.

147.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the 14D-9 was materially misleading to Company stockholders.

148.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the 14D-9 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the 14D-9.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the 14D-9 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

149.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Air Methods' business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the 14D-9 was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the 14D-9 and are therefore responsible and liable for the misrepresentations contained herein.

150.    The Individual Defendants acted as controlling persons of Air Methods within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Air Methods to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Air Methods and all of its employees.  As alleged above, Air Methods is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.    Enjoining the Proposed Acquisition;

C.    In the event defendants consummate the Proposed Acquisition, rescinding

it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.     Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Air Methods and obtain a transaction which is in the best interests of Air Methods and its shareholders;

F.     Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.


Dated: April 3, 2017

Respectfully submitted,


/s/ *Jeffrey A. Berens*

Jeffrey A. Berens
BERENS LAW LLC

2373 Central Park Boulevard, Suite 100
Denver, CO  80238
Tel:  (303) 861-1764
 Fax: (303) 395-0393
 jeff@jberenslaw.com

*Local Counsel for Plaintiff*

OF COUNSEL:

BRODSKY & SMITH, LLC
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Telephone: 610.667.6200
esmith@brodskysmith.com
mackerman@brodskysmith.com

## PLAINTIFF'S CERTIFICATION

I, Mr. Neil Sattler ("Plaintiff"), declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in Air Methods Corporation (Nasdaq: AIRM) of securities during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 1999 | 71,500 | — | — |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _3 1_ day of March, 2017.

Sign Name: _Neil Sattler_

Print Name: NEIL SATTLER

Address: 10752 N OXFORD CJ

State, Zip Code: MEQUON, WI 53092

County: USA